# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 04-127-P-H-01** |
| | ) | |
| **GARY H. REINER,** | ) | |
| | ) | |
| **DEFENDANT** | ) | |

## MEMORANDUM IN SUPPORT OF PRELIMINARY ORDER OF FORFEITURE

I have previously ruled that Gary Reiner has no right to jury trial on the government's request for an *in personam* money judgment of forfeiture. United States v. Reiner, No. 2:04cr127-01, ___ F. Supp.2d ___, 2005 WL 2542625 (D. Me. Oct. 12, 2005). Here, I make my findings of fact and conclusions of law determining the amount of the money judgment. See Fed. R. Crim. P. 23, 32.2(b)(1).

## I. PROCEDURAL BACKGROUND

On September 30, 2005, a jury convicted Reiner of an interstate prostitution conspiracy (Count 1);[1] violation of the Travel Act (Count 2);[2] inducement of interstate travel to engage in prostitution (Count 3);[3] and conspiracy to commit money laundering (Count 7).[4] At the end of the trial, the government narrowed its requested forfeiture relief to a personal money

---

[1] 18 U.S.C. §§ 371, 1952, 2421, and 2422.
[2] 18 U.S.C. § 1952.
[3] 18 U.S.C. § 2422(a).
[4] 18 U.S.C. §§ 1956(h), 1957.

judgment against Reiner—in the words of the Superseding Indictment, a "sum of money equal to the total amount of money [Reiner] obtained as proceeds from" the offenses for Counts 1, 2, and 3,[5] and a "sum of money equal to the total amount of money involved in" the conspiracy offense for Count 7.[6]

At a post-verdict forfeiture hearing on September 30, 2005, I invited both sides to present evidence on the forfeiture issues.  The government called one witness—Internal Revenue Service Agent Giguere—and submitted three exhibits.  The exhibits summarized the methodology Agent Giguere used to calculate the amounts the government is seeking.  Reiner's lawyers called no witnesses and objected to the admission of one exhibit that corresponded to the forfeiture request for Count 3.  I adjourned the hearing, allowing the parties to confer and the defendant to determine whether he wished to put on additional evidence and/or argument based upon the Kittery Health Club, Inc.'s[7] records (at least some of which had been admitted at trial).

On October 14, 2005, I held an on-the-record telephone conference with the lawyers to ascertain whether there was going to be additional evidence, and whether there was a need for any further briefing of the legal issues.  All the lawyers agreed that there was no need for additional evidence and that they had fully briefed the legal issues.[8]  The government explained the differing start

---

[5] Superseding Indictment ¶¶ 9(b), 10(c).

[6] Superseding Indictment ¶ 11(b).

[7] d/b/a/ the Danish Health Club, hereinafter the "Club."

[8] To my surprise, following the telephone conference, Reiner filed a document that included two objections suggesting that I had denied an evidentiary hearing.  Defendant's Objection to [the Government's Proposed] Preliminary Order of Forfeiture (Docket Item 170). Consequently, on October 24, 2005, I filed a Procedural Order (Docket Item 171) in which I ordered Reiner to "either withdraw the objections or make a proffer of the testimony of specific witnesses and/or *(continued next page)*

2

dates used in its calculations of the forfeiture amounts for the Count 1 conspiracy (August 23, 2000) and the Count 7 conspiracy (January 4, 1999).[9] Reiner's lawyers responded that they believed the dates used by the government were "correct." I asked for clarification of what they meant by "correct." Reiner's lawyers responded that if I should find Reiner responsible, the dates are proper in light of the government's explanation that (1) the beginning date for forfeiture calculations under Counts 1 and 2 is determined by the statute's effective date, and (2) the beginning date for forfeiture calculations under Count 7 is determined by the available bank records. The parties still requested that I make a factual finding on the amount of forfeiture for Count 3.

_____

exhibits that he believes I have prevented him from presenting." In Reiner's response to this order on October 26, 2005 (Docket Item 173), his lawyers repeated my own synopsis that "[a]t the bench hearing, the parties agreed that there were only legal—and no factual—disputes as to the forfeiture allegations connected to Counts 1, 2, and 7," and that, just as I understood it, the "parties agreed that although factual disputes as to the amount of forfeiture on Count 3 still existed," they were not going to present any additional evidence because the amount of forfeiture under Count 3 was so much less than that under the other three counts, and there would be only one forfeiture judgment. Defendant's Memorandum in Response to the Court's October 24, 2005 Procedural Order ¶¶ 3, 4. The evidentiary record, therefore, was closed as of October 14, and Reiner waived any right to present additional evidence on Counts 1, 2, 3 and 7, notwithstanding the fact that his lawyers then went on to enumerate additional evidence that they would present "[i]f the Court requires additional testimony or evidence to make the determination as to the amount of the forfeiture on Count 1." Id. ¶ 6. (Frankly, I do not understand this latter statement. It is the parties' role to decide what evidence to present. The burden of proof is on the government to establish the amounts it seeks to forfeit. My role is to determine whether the government has met its burden of proof, not to instruct the defendant whether to present more evidence.) Finally, Reiner's lawyers assert that Reiner "preserved the issue that he is entitled to a set off on the outstanding forfeiture obligation based upon estate taxes paid to the federal government." Id. ¶ 7. I am aware of no basis for any such setoff.

[9] The beginning date for Counts 1 and 2 is the effective date of 28 U.S.C. § 2461(c), first allowing the government to seek forfeiture criminally rather than just civilly for certain crimes. See 28 U.S.C. 2461(c) Historical and Statutory Notes, Effective and Applicability Provisions ("Amendments by Pub. L. 106-185 (adding subsection c)" are "applicable to any forfeiture proceeding commenced on or after the date that is 120 days after April 25, 2000."). The money laundering crime (Count 7) has no comparable date limitation for criminal forfeiture.

The only question that remains, then, is the amount of forfeiture to order on each count.  According to Fed. R. Crim. P. 32.2(b)(1): "If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay."

## II.  ANALYSIS

### (A)    Count 1

The government asserts that Reiner obtained $3,927,392.40 in proceeds under the interstate prostitution conspiracy conviction.  18 U.S.C. § 371.  See Superseding Indictment ¶ 9(b); Gov't Ex. F-1.  "Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' . . . or a conspiracy to commit such [an] offense" is subject to civil forfeiture.  18 U.S.C. § 981(a)(1)(C).  If it is subject to civil forfeiture, it is also subject to criminal forfeiture, 28 U.S.C. § 2461(c), the relief the government requests here.

In United States v. Candelaria-Silva, 166 F.3d 19, 42 (1st Cir. 1999), the First Circuit specifically approved money judgment forfeitures as one of "several forms" a criminal forfeiture can take, rather than limiting forfeiture relief to specific property or traceable proceeds.[10]  Interpreting a "proceeds"

---

[10] Nevertheless, I am aware that the Advisory Committee Note pointedly raises a caution: "A number of cases have approved use of money judgment forfeitures.  The Committee takes no position on the correctness of those rulings."  Fed. R. Crim. P. 32.2 Advisory Committee Notes (2000 Rule Adoption).  Indeed, the statutes involved in this case are comprehensive in their treatment of forfeiture of specified property or traceable proceeds.  There is, therefore, some question as to why any additional forfeiture remedy should be recognized.  See United States v. Croce, 334 F.Supp.2d 781, 794 n.23, 795 (E.D. Pa. 2004) (concluding that although the government remains entitled to the forfeiture of specific property involved in the underlying offense under 18 U.S.C. § 982, the court would not permit a nonspecific and unlimited forfeiture money judgment to "haunt the defendants for the rest of their lives:" "[W]e are not persuaded by [the decision in Candelaria-Silva]" because the First Circuit "offers no authority *(continued next page)*

4

forfeiture statute much like that for Count 1,[11] the First Circuit held that "the government is entitled to an *in personam* judgment against the defendant for the amount of money the defendant *obtained as proceeds* of the offense."  Id. (emphasis supplied).  The First Circuit has made clear that "proceeds" means gross revenue, not just profits.  United States v. Hurley, 63 F.3d 1, 21 (1st Cir. 1995) ("[T]he broader definition of 'proceeds' seems to us a rather easy call"); United States v. Iacaboni, 363 F.3d 1, 4 (1st. Cir. 2004) ("We have previously rejected Iacaboni's interpretation of the term 'proceeds' [as net profits] in the RICO forfeiture context.  Iacaboni has offered no rationale for abandoning that approach here [for forfeiture under 18 U.S.C. § 982(a)(1).]") (internal citation omitted).  The question for me in deciding the Count 1 forfeiture, therefore, is what amount the government has established that Reiner "obtained as proceeds" from his violation of the Count 1 interstate prostitution conspiracy offense.  See Candelaria-Silva, 166 F.3d at 42.  In United States v. Hurley, the First Circuit held that proceeds are "obtained" by a defendant even "when it has merely been held in custody by that individual and has been passed along to its true owner."  63 F.3d at 21.

_____

or reasoning to support its assertion, suggesting that it simply assumed that the Government was entitled to a forfeiture money judgment without carefully considering the question"), adhered to on reconsideration, 345 F. Supp.2d 492, 497 (E.D. Pa. 2004).  Obviously, as a trial judge within the First Circuit, I follow Candelaria-Silva unless and until the First Circuit overrules it.

[11] In Candelaria-Silva, the court was interpreting 21 U.S.C. § 853, the criminal forfeiture provision of the Controlled Substances Act.  Section 853(a)(1) directs forfeiture of "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation."  Similarly, the forfeiture statute here, 18 U.S.C. § 981(a)(2), applies to "proceeds," defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture" (applicable to criminal forfeiture through 28 U.S.C. § 2461(c)).

The standard of proof for the Count 1 forfeiture, based upon 28 U.S.C. § 2461(c), is preponderance of the evidence.  Section 2461 incorporates all the procedural sections of the Controlled Substances Act, 21 U.S.C. § 853 (other than subsection (d) relating to rebuttable presumptions created at trial in narcotics cases).  The First Circuit has held that the standard of proof for forfeitures under section 853 is preponderance of the evidence.  United States v. Keene, 341 F.3d 78, 85-86 (1st Cir. 2003) (refusing to apply the burden of proof requirements of Apprendi v. New Jersey, 530 U.S. 466 (2000), to criminal forfeitures, and holding that the preponderance "evidentiary standard used to impose the forfeiture was proper") (citing United States v. Rogers, 102 F.3d 641, 647 (1st Cir. 1996) (observing with approval that "almost every circuit that has pronounced on the issue has held the standard of proof as to forfeiture issues under section 853 . . . is a preponderance of the evidence.").  I therefore apply that standard to section 28 U.S.C. § 2461(c).

IRS Agent Giguere testified that he derived the government's requested forfeiture amount for Count 1 by calculating the total deposits going into the Club's Ocean National Bank Business Operating Account.  See also Gov't Ex. F-1. He limited his calculations to the time period between August 23, 2000, the effective date of 28 U.S.C. § 2461(c), and June 9, 2004, the date federal agents raided and shut down the Club.  Reiner has not challenged the accuracy of Giguere's calculations.

What Reiner *does* challenge is the assertion that these deposits are all proceeds of illegal activity.  I reject the challenge.  The purpose of this so-called

6

"health club" was prostitution.  The deposits all derived from cash and credit card sales from the Club's operations, or payments by the prostitutes to the Club for the privilege of working there—all illegal proceeds.  The overwhelming evidence established that customers, mostly from out of state, paid a $70 entrance fee (either in cash, or by credit card payments, stipulated at trial to have been transferred via interstate channels).   Then they proceeded to a lounge area to select one of several available "attendants."  The customer and the attendant next went to a private room where they negotiated payment—in the form of a cash tip paid directly to the attendant—for sexual favors.  The fact that a few customers were content to have only a massage does not alter the overall purpose of the operation.   The massage "licenses" the attendants obtained and their skimpy "training" in the art of massage,[12] just like the Club's seemingly legitimate locker room, whirlpool, spa, and entrance fee, were all just a front so that the health club could remain open as a house of illegal prostitution.   The Club's highly sexually suggestive advertisements strongly support this conclusion.  Testimony at trial revealed that Reiner had a role in the hiring and licensing of the attendants, nearly all of whom lived out of state and traveled to the Club daily to engage in prostitution; that Reiner met and spoke regularly with their pimps, including Lance Williams, particularly when

---

[12] The government established at trial that a Kittery Town Ordinance required the attendants to obtain massage licenses and required massage training as a prerequisite, but that in fact the attendants obtained their diplomas by paying a fee without actually attending massage school for the required number of hours.  The massage "school" was set up by someone that Reiner introduced to Leo Manzoli, the original owner of the Club.  (After Manzoli died in 1996, ownership and management of the Club passed to Joel Lehrer; after Lehrer died on October 29, 2001, ownership of the Club passed to his wife, Susan Lehrer, and management of the Club soon passed on to Reiner).

customers complained about a prostitute; and that Reiner worked with others at the Club to design an advertising scheme targeted specifically at drawing more out-of-state customers.

Based on this and other evidence presented at trial, the jury found beyond a reasonable doubt that Reiner knowingly and willingly conspired with Lance Williams, Cheryl A. Stilwell, the Club, and others to use interstate commerce facilities to promote prostitution, to transport persons in interstate commerce with the intent that they engage in prostitution, and/or to induce and entice persons to travel in interstate commerce to engage in prostitution. In short, the interstate prostitution conspiracy for which Reiner was convicted was the "cause in fact" of the acquisition of the deposited Club funds.  They "would not have been acquired or maintained but for the defendant's [and his co-defendant's]" illegal activities.   United States v. Angiulo, 897 F.2d 1169, 1213 (1st Cir. 1990).[13]

The First Circuit has held that conspirators are vicariously liable for the foreseeable criminal conduct of their co-conspirators and therefore can be required to forfeit proceeds that other members of the conspiracy foreseeably reap.   Hurley, 63 F.3d at 22-23 (co-conspirators are vicariously liable for a $136 million RICO forfeiture) (citing Pinkerton v. United States, 328 U.S. 640, 646-47 (1946)); see also Candelaria-Silva, 166 F.3d at 43 (participants in a drug conspiracy are jointly and severally liable for forfeiture of the full amount of the proceeds); United States v. White, 116 F.3d 948, 951 (1st Cir. 1997)

---

[13] The fact that Reiner or his law firm may ultimately have received some of these funds in payment for legal services is irrelevant.

(forfeiture of property that is fruit of drug-related criminal activity is not limited to proceeds defendants personally obtained; rather, defendants are jointly and severally liable for proceeds obtained by their coconspirators).   "The government can collect [the total amount subject to forfeiture] only once but, subject to that cap, it can collect from any [co-conspirator] so much of that amount as was foreseeable to that [co-conspirator]." Hurley, 63 F.3d at 23.[14]

Therefore, on Count 1, the interstate prostitution conspiracy count, I conclude that the government has met the forfeiture requirements, laid out by the First Circuit in Hurley and Candelaria-Silva, for all the Club revenues once Reiner joined the conspiracy.   These receipts—proceeds of the Count 1 interstate prostitution conspiracy offense—were foreseeable to Reiner. Although Reiner argues that he should not be liable for any amounts the Club collected before Joel Lehrer (the former owner and day-to-day manager of the Club) died on October 29, 2001, that date merely marks the beginning of Reiner's personal role in deposits and withdrawals.   (Soon after October 2001, Reiner personally deposited the Club's revenues into its Operating Account at Ocean National Bank.   See Gov't Ex. F-1.)   But the conspiracy and Reiner's membership in the conspiracy went back to at least the beginning date for which the government seeks forfeiture, August 23, 2000.[15]   Reiner "obtained"

---

[14] Hurley explained:  "It is largely fortuitous whether an individual co-conspirator happened to possess the laundered funds at a particular point.   If conclusive weight were given to who physically handled the money, a low-level courier or money counter could be liable for vast sums, while other higher level conspirators could easily escape responsibility.   So long as the amount handled by others is foreseeable as to a defendant, the foreseeable amount represents the sounder measure of liability." Id. at 22.

[15] I find by a preponderance of the evidence that Reiner joined this conspiracy long before August 23, 2000.   Evidence and testimony at trial established that in his relationship with the
*(continued next page)*

the Club proceeds at the latest when he or one of one of his co-conspirators deposited them into the Club bank account during the time period established by the government (August 23, 2000, to June 9, 2004).  See Hurley, 63 F.3d at 21 (finding "obtained" to mean no more than "temporary custody").[16]  Indeed, since the Club itself was a co-conspirator, Reiner obtained the illegal proceeds within the meaning of Hurley when the Club received them.

I conclude, therefore, that the government is entitled to $3,927,392.40 as the total amount in proceeds that Reiner obtained from the Count 1 conspiracy offense.

**(B)   Count 2**

Count 2, the Travel Act conviction (using interstate commerce facilities to

_____

Club and its owners, Reiner was not merely acting as a lawyer counseling a client on the legal consequences of a proposed course of conduct.  Rather, Reiner was assisting his client, with willful blindness if not more, in thwarting the law.  See Model Rules of Prof'l Conduct R. 1.2(2) (2002) ("A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent").  Russell Pallas testified that Reiner met with pimps in April of 2000, well before Lehrer's death.  See also Gov't Ex. 109 (legal bills indicating Reiner's meeting with pimps on April 10, 2000 and Reiner's conference with "Joel [Lehrer] and three gentlemen from Boston from employment issues" on April 11, 2000).  Cheryl Vinton, a prostitute at the club, testified that prior to Joel Lehrer's death, Reiner attended approximately fifty percent of the mandatory meetings for all of the women who worked at the club where they discussed issues such as problems with the attendants overcharging customers and cutting sessions short, the attendants' attire, the Club's rules and regulations (such as being on time and fines), customer complaints, and complaints by the women who worked at the Club. Additionally, evidence admitted at trial established that Reiner was involved with disputes between a customer and a "masseuse" prior to Joel Lehrer's death.  See Gov't Ex. 109 (legal bill from February 7, 2001 listing "Telephone call from Susan Lehrer; re: argument between customer and masseuse; Travel to club; Discussion with customer; Discussion with masseuse; Discussion with witnesses; Discussion with Susan; Telephone call with Joel").  Exhibits admitted at trial also established that Reiner was involved with day-to-day management and employment issues at the club prior to Joel Lehrer's death.  See, e.g., Gov't Ex. 106 (legal bill from March 19, 2001 listing "Telephone conference. With Joel Lehrer re: reception desk coverage and scheduling difficulties with staff"); Gov't Ex. 109 (legal bill including Jan. 29 1999: "Telephone call with Joel . . . travel to club re: applications for two masseuses").

[16] Admittedly, Reiner only delivered the Club monies to the Bank, and never had any right to them.  However the Hurley court, "[l]ooking at criminal forfeiture . . . as a kind of shadow fine," id., broadly swept into its analysis the mere courier who had no more right to the drugs than Reiner had to the monies he deposited.

carry on prostitution or aiding and abetting that conduct), does not charge a conspiracy.  The government nevertheless seeks forfeiture in the same amount as Count 1 ($3,927,392.40).  <u>See</u> Gov't Ex. F-1.  It claims that these are the total proceeds Reiner obtained from violating the Travel Act or aiding and abetting Lance Williams, a pimp who supplied attendants for the Club, and/or Cheryl A. Stilwell, a prostitute who worked for Williams at the Club, and/or the Club itself.  As described above, Reiner argues that he was not personally involved in the Club's revenue collections until at least after Lehrer died October 29, 2001.  But I conclude that the First Circuit principles of vicarious liability for forfeiture by coconspirators extend equally to an aider and abettor. At the very least, Reiner aided and abetted the Club in generating its illegal revenue from interstate travel to engage in prostitution (the Travel Act violation) throughout the relevant time period.  I find, therefore, that the government is entitled to the same amount of forfeiture on Count 2 as on Count 1, $3,927,392.40.[17]

*(C)    **Count 3***

With respect to Count 3, the government seeks a personal money judgment against Reiner for $745,200 for his conviction under 18 U.S.C. § 2422(a).  <u>See</u> Superseding Indictment ¶ 10(c); Gov't Ex. F-2.  Under 18 U.S.C. § 2253(a) "[a] person who is convicted of an offense under . . . [18 U.S.C. §] 2422 . . . shall forfeit to the United States such person's interest in" "any

---

[17] The forfeiture in Count 2 is based upon 28 U.S.C. § 2461(c).  As explained in Count 1, <u>supra</u>, I conclude that the standard of proof for forfeitures based upon 28 U.S.C. § 2461(c) is a preponderance of the evidence. I discuss aider and abettor forfeiture liability further under Count 3, <u>infra</u>.

property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense." Amounts are subject to forfeiture if the "trier of fact determines, *beyond a reasonable doubt*, that such property is subject to forfeiture." 18 U.S.C. § 2253(e) (emphasis supplied). At the telephone conference, the government agreed that proof beyond a reasonable doubt is the standard for forfeiture relief on Count 3.

On Count 3, the jury convicted Reiner of inducing Tara Morales to travel in interstate commerce to engage in prostitution, or aiding and abetting her pimp, Lance Williams, or the Club itself, to induce her to do so. There are two components to the government's forfeiture request under this count: the tips that Tara Morales earned from sexual favors and gave to her pimp Lance Williams; and the Club's direct receipts from Tara Morales's customers.

IRS Agent Giguere generated the government's $745,200 forfeiture number. He testified that he "extrapolated" the amount from three figures presented to the jury: (1) the total number of months Tara Morales testified that she worked at the Club (Agent Giguere calculated 34-½ months); (2) the average number of customers she saw per day (according to Agent Giguere, 4 to 5 customers per day, 20 per week, 80 per month); (3) the average amount she earned in tips per session ($200, according to Agent Giguere). Agent Giguere explained that he multiplied the Club's standard entrance fee ($70) by the number of customers Tara Morales "presumably" saw during her employment (2,760 customers[18]) to get a total of $193,200. He calculated Tara

---

[18] 2,760 customers is 80 customers per month times 34-½ months.

Morales's tip revenue as $552,000 by multiplying the postulated number of her customers (2,760) by her average tip ($200).   Together these two numbers yielded $745,200.

As to the Club's receipts, uncontradicted evidence showed that during Morales's employment, Reiner took custody of all the Club's receipts and deposited them in the Club's Business Operating Account at the Ocean National Bank.   Clearly, therefore, the Club's receipts for patrons with whom Morales illegally exchanged sex for money were "obtained by" Reiner.   He held them in temporary custody and passed them along, sufficient for forfeiture under <u>Hurley</u>, 63 F.3d at 21.   Alternatively, he aided and abetted the Club in generating the illegal revenues.

On the other hand, the evidence does not support the assertion that Reiner "obtained" the tips that Tara Morales earned.   Instead, she gave these amounts directly to her pimp, Lance Williams; Reiner never touched them.   Any forfeiture liability for these amounts, therefore, must be based upon aider and abettor liability.   I conclude that the government established beyond a reasonable doubt that Reiner aided and abetted Williams in obtaining Morales's tips revenue.   For example, it was Reiner who fired Tara Morales from the Club because of her drug problems, her attitude problems, her difficulty getting along with manager Russell Pallas, and her overcharging customers for sex.   It was Reiner who allowed her to return to the Club to work after a meeting with her pimp, Williams, in Kittery, Maine, reassured him that Tara Morales would behave differently.   Additionally, Williams testified that Reiner called him whenever there was a problem with Morales's work at the Club.   Witnesses

13

testified about a meeting among Reiner, Pallas, and Williams at the Squire Club in Boston, where they discussed the prospect of Williams bringing more women from the Boston area to work at the Club.

As I instructed the jury on this Count, to prove that Reiner aided and abetted, the government had to prove that he "consciously shared the other person's knowledge of the criminal conduct, intended to help him or her, and willfully took part in the endeavor, seeking to make it succeed." Therefore, just as the First Circuit does not limit a conspiracy count forfeiture to proceeds that the defendant personally obtained, Hurley, 63 F.3d at 22 (conspirators can be required to forfeit proceeds foreseeably reaped by other members of the conspiracy), I conclude that as an aider and abettor Reiner must forfeit Morales's tip proceeds foreseeably reaped by the principal, here the pimp Lance Williams.

The remaining determinations are the actual amount of revenues that the government can prove was generated by the Club from Tara Morales's customers; and the total amount of Tara Morales's tips. There certainly was better evidence available (the actual Club records) than Agent Giguere's "extrapolations" to calculate these amounts.[19] But because the parties have not analyzed this better evidence, neither do I.[20] Instead, I find flaws in the figures

---

[19] At the bench hearing, Agent Giguere admitted on cross-examination that the government had in its possession and introduced at trial records from the Club that would indicate more precisely the number of customers each attendant saw per shift as well as employee attendance records. Even though there was trial testimony concerning Tara Morales's drug habit and unreliability as an employee, he did not review these club records for his forfeiture testimony calculating how many days Tara Morales actually showed up at work, how many hours she actually worked when she appeared, or how many customers she actually served.

[20] The parties' failure to do so is understandable: the amount sought under Count 3 is, in *(continued next page)*

upon which Agent Giguere did rely to produce his calculations. Therefore, I do not find that the government has established the requested amount beyond a reasonable doubt, and I award a smaller amount.

First, using the government's own methodology, I find that if "Morales work[ed at the Club] from July 2001 to June 9, 2004" but was "fired for several weeks (4 to 6 weeks) before being rehired," Gov't Ex. F-2, her total working time at the Club could not have been the government's 34-½ months. Id. When I do the same arithmetic, I find that Morales's total working time was 147 full weeks if she started July 1, 2001, worked until June 9, 2004, and was fired for six weeks.[21] But it could have been as low as 143 full weeks (if she started July 31, 2001).[22] Because the government's burden is proof beyond a reasonable doubt, I base my calculations on the lower amount, 143 weeks.

Next, the government asserts that Tara Morales averaged 4 to 5 customers per day. According to my notes, however, Tara Morales never testified about the number of customers she averaged per shift or per day.[23] Instead, she testified only that she started out working double shifts five days a week at the Club, but at some point reduced to four double shifts, leaving after

_____

practical effect, entirely subsumed by the greater amounts sought by the government on Counts 1, 2, and 7.

[21] From Sunday, July 1, 2001 until Wednesday, June 9, 2004, is 1,074 total days or 153.4 weeks; if she was fired for 6 weeks, her working time was 147.4 weeks, assuming no vacations or other time off.

[22] From Tuesday, July 31, 2001 until Wednesday, June 9, 2004 is 1,044 total days or 149.1 weeks; if she was fired for 6 weeks, her working time was 143.1 weeks, assuming no vacations or other time off. At an average 4.3 weeks per month, that is approximately 33.3 months.

[23] Cheryl Vinton, another prostitute at the club, testified that on "an average good day" she would have "maybe four or five" customers, but that there were some days when she saw only "one or two [and] some days [she] didn't see any." Dalphine Van Tassel testified that, while the number of customers she had at the Club varied depending on the season or time of year, "[t]here were shifts where I saw none, there were shifts where the maximum, very maximum might be four or five [customers], but that was not common for me."

the first shift on Mondays.  Therefore, I do not find beyond a reasonable doubt that Tara Morales averaged 20 customers per week as the government asserts.

The government asserts that Tara Morales's average tip per session was $200.  Tara Morales testified that she charged different amounts for different sexual acts.  She did admit that the rate for "intercourse itself" was "200 [dollars]" but that she "usually" requested $300 or more, and that she had only "maybe ten" sessions when she did not exchange any form of sex for money.  But she did not testify how much she charged for sexual acts other than intercourse.[24]  Alternatively, she testified that on a "slow day" she averaged "like 6 [hundred dollars]" and that on a "good day" she averaged "15 [hundred], sometimes a little more."  She also testified that the very least she ever brought home was "maybe like 4 [hundred dollars]."  As the government's standard of proof is beyond a reasonable doubt, I can find at most that Tara Morales averaged $600 per day [with two days at $1,500 and one day at $400].  On this basis, I calculate Tara Morales's tip revenue as $430,600.[25]

To determine the Club's revenues from Morales's customers, I must first determine the number of her customers, then multiply that amount by the Club's $70 entrance fee.  Because the parties did not present to me Club records about how many customers Tara Morales had, I will determine the number indirectly from what I have calculated to be her total tips. I will assume that Tara Morales collected from each customer the maximum tip

---

[24] In comparison, other attendants at the club testified that they received anywhere between $50 and $200 in tip money depending on the sexual act performed.

[25] I find that the government has proven beyond a reasonable doubt that Tara Morales had 715 working days (143 weeks, 5 days per week) at the Danish Health Club.  $430,600 = (712 days times $600) + (2 days times $1,500) + (1 day times $400).

amount that she testified she collected, $200.  (She testified that she usually asked for $300, but not that she received it.  In any event, she received even less for other sexual acts, so I am satisfied that the $200 figure will yield an appropriate number of customers beyond a reasonable doubt.)  Total tip revenue, $430,600, divided by the maximum tip, $200, yields 2,153 customers.  Club revenues, therefore, were $150,710 (2,153 customers times $70 per person).

My calculations, then, on the amounts generated by Tara Morales's activities are $150,710 in Club revenues and $430,600 in tips, for a total of $581,310.  Reiner must forfeit $581,310 under Count 3 according to the standards of Candelaria-Silva and Hurley.

**(D)** **Count 7**

For the money laundering conspiracy (Count 7), the government is seeking $3,349,602.26 as a "sum of money equal to the total amount of money involved" under 18 U.S.C. §§ 1956(h), 1957.  See Superseding Indictment ¶ 11(b); Gov't Ex. F-3.  Section 982(a)(1) directs forfeiture upon conviction of a violation of 18 U.S.C. §§ 1956 or 1957 of "any property, real or personal, involved in such offense."

The government's burden of proof for money laundering forfeitures under 18 U.S.C. § 982(a)(1) is "preponderance of the evidence."  United States v. Cunan, 156 F.3d 110, 116 & n.7 (1st Cir. 1998) ("In a criminal forfeiture [pursuant to 18 U.S.C. § 982 and 21 U.S.C. § 853], the government must show by a preponderance of the evidence that the defendant's property is forfeitable."); see also United States v. Voigt, 89 F.3d 1050, 1082 (3d Cir. 1996)

(preponderance of the evidence, rather than proof beyond a reasonable doubt, governs government's proof of forfeiture allegations under 18 U.S.C. § 982)(a)(1)).

The plain language of section 982(a)(1) suggests that the scope of the forfeiture under Count 7 is at least as broad as, probably broader than, Count 1.  Unlike forfeiture under section 981(a)(1) and its criminal counterpart 28 U.S.C. § 2461(c), forfeiture under section 982 is not limited to amounts "obtained by" the defendant but extends to "any property . . . involved in such offense."  In United States v. McGauley, the First Circuit cited approvingly the legislative history related to section 981 (the civil forfeiture statute that has language identical in many respects to section 982, the criminal forfeiture statute), which indicates that Congress intended "property . . . involved in" to be construed broadly:  "[T]he term 'property involved' is intended to include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense."  279 F.3d 62, 76 n.14 (1st Cir. 2002) (quoting 134 Cong. Rec. § 17365 (daily ed. Nov. 10, 1988)).  As a result, McGauley suggested that the standard for determining what funds are "involved in" a money laundering offense is less demanding than that for establishing "proceeds" obtained (discussed in Counts 1, 2, and 3, supra).  Id. at 76-77 (distinguishing the proof for "proceeds" from that for "involved in," and holding that forfeiture of both legitimate and illegitimate funds is proper "as long as the government demonstrates that the

defendant pooled the funds to facilitate, i.e., to disguise the nature and source of, his scheme.") (citation omitted).[26]

My discussion of vicarious liability for co-conspirators in Count 1, <u>supra</u>, also applies to Count 7.  <u>Accord</u> <u>United States v. Huber</u>, 404 F.3d 1047, 1056 (8th Cir. 2005) ("The corpus of a money-laundering conspiracy is the funds that the defendant conspired to launder.").

For Count 7, Agent Giguere explained that he added up all the disbursements in amounts over $10,000[27] going out of the Club Business Checking Account at Ocean National Bank.  His calculations, which are undisputed, started January 4, 1999, the first date for which the government was able to obtain bank records, and concluded June 2, 2004, just before the government raid shut down the Club.  <u>See</u> Gov't Ex. F-3.  These deposits were

---

[26] Other Circuits also interpret the term "involved in" broadly, including property directly used to commit, or used to facilitate, the money laundering offense.  <u>See</u>, <u>e.g.</u>, <u>United States v. Huber</u>, 404 F.3d 1047, 1056 (8th Cir. 2005) ("Forfeiture under section 982(a)(1) in a money-laundering case allows the government to obtain a money judgment representing the value of all property 'involved in' the offense, including 'the money or other property being laundered (the corpus),' and 'any property used to facilitate the laundering offense.'") (citation omitted); <u>United States v. Baker</u>, 227 F.3d 955, 969, 971 (7th Cir. 2000) ("'[A]ll of the funds from Baker's prostitution business over the years—both the proceeds from credit card and ATM transactions and other proceeds—were illegal, and as a result Baker <i>laundered all of them</i>"; "because the millions of dollars that Baker generated from his prostitution business over the years facilitated his money laundering conspiracy, the district court did not clearly err in including these proceeds in its forfeiture order as monies 'involved in' Baker's offense."); <u>United States v. Bornfield</u>, 145 F.3d 1123, 1135 (10th Cir. 1998) ("Property 'involved in' an offense 'include[s] the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense") (citation and emphasis omitted).  <u>See also</u> Stefan D. Cassella, <u>The Forfeiture of Property Involved in Money Laundering Offenses</u>, 7 Buff. Crim. L. Rev. 583, 615 & n.80 (2004) ("Based on the legislative history, seven Courts of Appeals and numerous lower courts have held that the term 'property involved' should be read broadly to include the money or other property being laundered (the 'corpus' or 'subject matter' of the money laundering offense); any commissions and fees paid to the money launderer; and any property used to facilitate the money laundering offense.  No court has held to the contrary.").

[27] The money laundering crime in Count 7 involves only amounts of this size.  <u>See</u> 18 U.S.C. § 1957(a) ("Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 . . . derived from specified unlawful activity, shall be punished as provided in subsection (b).")

disbursed primarily to K&D Realty Trust (of which Reiner ultimately was a trustee) as well as to Reiner, Reiner's law firm, and co-defendant Mary Ann Manzoli, the beneficiary of K&D Realty Trust.

As articulated by the Eighth Circuit, "the corpus of a money-laundering conspiracy rests on whether certain conduct involving funds constitutes money laundering." Huber, 404 F.3d at 1056. The jury verdict on Count 7 shows beyond a reasonable doubt that Reiner conspired with the Club and other persons knowingly to engage in monetary transactions of more than $10,000 involving criminally derived funds from specified unlawful activity, namely, violations of the Travel Act, transporting persons in interstate commerce with the intent that such individuals engage in prostitution, and enticing persons to engage in prostitution. That activity constitutes illegal money laundering.

I conclude that the government has established by a preponderance of the evidence, therefore, that the funds disbursed out of the Club's bank account were proceeds "involved in" those specified unlawful activities.[28] I also find by a preponderance of the evidence that the January 1999 start date is appropriate for Count 7.[29] Since Agent Giguere's calculations have not been

---

[28] I note that 18 U.S.C. § 982(b)(2) "protects against forfeiture a defendant who 'acted merely as an intermediary who handled but did not retain the property' unless the defendant 'conducted three or more separate transactions involving a total of $100,000 or more in a twelve-month period.'" Hurley, 63 F.3d at 21-22, quoting 18 U.S.C. § 982(b)(2). Because of the number of transactions, Reiner does not qualify for this "narrow safe harbor," id.

[29] I find by a preponderance of the evidence that Reiner joined the conspiracy well before January 4, 1999. As explained for the conspiracy in Count 1, supra, I find that Reiner was not only counseling but assisting his clients in conduct he knew to be illegal. As Reiner described in his own testimony, after 1992 when he first negotiated with Leo Manzoli for compensation for his work on behalf of the Club, he was "steadily being asked to do more and more for either Joel [Lehrer] or K&D Realty Trust, [or] for Mary Ann [Manzoli]." Between 1990 and 2001, for example, Reiner testified that he was involved with the Club efforts to comply with the Kittery Town Ordinance regulating massage therapy—including "explain[ing] to somebody what [she] *(continued next page)*

challenged, the government is entitled to a forfeiture of $3,349,602.26   on Count 7.

**(E)       _The Excessive Fines Clause of the Eighth Amendment_**

Without citing any cases, Reiner's legal memorandum asserts that the forfeiture violates the Eighth Amendment.

"Forfeitures are subject to the Eighth Amendment's excessive fines clause 'if they constitute punishment for an offense'" but a "forfeiture will violate the Eighth Amendment's prohibition only if it is 'grossly disproportional to the gravity of the defendant's offense.'" United States v. Heldeman, 402 F.3d 220, 223 (1st Cir. 2005) (quoting United States v. Bajakajian, 524 U.S. 321, 328, 336-37 (1998)); Candelaria-Silva, 166 F.3d at 44 ("It is well-established . . . that the imposition of such a forfeiture judgment [under the principle of joint and several liability] does not constitute an unconstitutionally excessive fine.").  The First Circuit considers: "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." Heldeman, 402 F.3d

---

had to do to comply with the town's ordinance," helping her fill out the application if necessary, and even arranging for a massage therapy "school" with his contact in Vermont.   Cheryl Vinton, who started working at the Club in 2000, stated that Reiner attended at least the majority of employee meetings; Reiner himself admitted that he attended two or three meetings "from 2000 to, say, September of 2001" in which the overcharging of customers was discussed. Legal records from the firm of Reiner and Bouffard indicate that Reiner was involved in employee matters with the prostitutes in early 1999.  See Gov't Ex. 109 (2/26/99: "Travel to Kittery Health Club conference with client; re: corporate personnel matters;" 3/3/99: "Travel to Club conference with Joel [Lehrer] and J.B. re: personnel matter; Telephone conference with client; re: personnel matters; Office conference with client; re: personnel matters.") Despite Reiner's protestation that illegal prostitution at the Club was never proven to him, I am satisfied, as was the jury, that at least under the willful blindness standard he possessed the necessary criminal intent and joined the conspiracy at an early date.

at 223.

Applying the <u>Heldeman</u> factors, I conclude first that Reiner plainly falls into the class of persons at whom the relevant criminal statutes[30] were directed—Reiner assumed a leadership role for the Club, the hub of the illegal activity. Next, I conclude that this forfeiture judgment is in line with other penalties authorized. For the Count 7 conviction, Congress has authorized a fine of up to twice the amount of the criminally derived property, 18 U.S.C. § 1957(b)(2) ("The court may impose an alternate fine to that imposable under paragraph (1) of not more than twice the amount of the criminally derived property involved in the transaction"), <u>i.e.</u>, twice the amount of the laundered money. The forfeiture awarded here is well under that authorized penalty.[31] Finally I conclude that this forfeiture award is consonant with the harm Reiner personally caused. His involvement with this hugely successful interstate prostitution operation for over a decade allowed the business not only to survive, but to flourish. Without his self-described "devot[ion] of his best efforts" to rescue the Club from mismanagement and economic disarray, the Club might well have failed, and women and customers would not have crossed state lines to engage in prostitution.

As a result, I conclude that the forfeiture the government seeks is not "grossly disproportional to the gravity of [Reiner's] offense[s]." <u>Bajakajian</u>, 524 U.S. at 337. The government seeks a single money judgment against Reiner in

---

[30] 18 U.S.C. §§ 2, 371, 1952, 1956(h), 1957, 2421, and 2422.
[31] I do not analyze whether the forfeiture amounts could withstand the excessive fine challenge on the other counts if the Count 7 conviction should fail.

the amount of $3,927,392.40—the greatest amount sought for all four Counts—to avoid any double counting.  "[H]olding a defendant liable for an amount of money foreseeably laundered by himself and his own co-conspirators is quite rational based on a proportionality analysis." Hurley, 63 F.3d at 23 (rejecting an Eighth Amendment challenge to a forfeiture judgment). "The government can collect its" $3,927,392.40 "only once, but subject to that cap, it can collect from any [co-conspirator] so much of that amount as was foreseeable to that [co-conspirator]." Id.  The amounts here were not only reasonably foreseeable to Reiner but largely known to him.

### III. Conclusion

Count 3 supports a money judgment in the amount of $581,310.  Count 1 and 2 each supports a money judgment in the amount of $3,927,392.40. Count 7 supports a money judgment in the amount of $3,349,602.26.

The government shall file a preliminary order of forfeiture reflecting the largest amount, $3,927,392.40, as a joint and several liability on the part of Reiner with his co-defendants.[32]

**So Ordered.**

**Dated this 31st day of October, 2005**

/s/ D. Brock Hornby

**D. Brock Hornby**
**United States District Judge**

---

[32] The parties agreed at the telephone conference that Reiner's liability is joint and several with that of the other co-defendants.

23

**U.S. DISTRICT COURT**
**DISTRICT OF MAINE (PORTLAND)**
**CRIMINAL DOCKET FOR CASE #: 04CR127-01**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | Represented by | **GEORGE T. DILWORTH**<br>Assistant United States Attorney<br>District Of Maine<br>P.O. Box 9718<br>Portland, ME 04104-5018<br>(207) 780-3257<br>email: george.dilworth@usdoj.gov |
| | | **F. TODD LOWELL**<br>Assistant United States Attorney<br>District Of Maine<br>P.O. Box 9718<br>Portland, ME 04104-5018<br>(207) 780-3257<br>email: todd.lowell@usdoj.gov |

**v.**

| | | |
|---|---|---|
| **GARY H. REINER**<br><br>    **Defendant** | Represented By | **JAMES D. ROSENBERG**<br>**STEVEN M. GORDON**<br>Shaheen & Gordon, P.A.<br>P.O. Box 2703<br>Concord, NH 03302-2703<br>(603) 225-7262<br>email: jrosenberg@shaheengordon.com<br>sgordon@shaheengordon.com |
| | | **ALAN G. STONE**<br>Skelton, Taintor & Abbott<br>P.O. Box 3200<br>Auburn, ME 04212-3200<br>(207) 784-3200<br>email: astone@3200.com |

24